## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
No. X:XX-CV-XX

| | |
|---|---|
| ST. PAULS COMMUNITY ASSOCIATION FOR PROGRESS, <br><br> Plaintiff, <br><br> v. <br><br> ROBESON COUNTY, NORTH CAROLINA, <br><br> Defendant. | **COMPLAINT** <br> Fed. R. Civ. P. 7 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff St. Pauls Community Association for Progress ("CAP") files this Complaint against Defendant Robeson County, North Carolina ("Defendant" or "the County") and alleges as follows:

### STATEMENT OF THE CASE

1. Plaintiff brings this citizen suit for declaratory and injunctive relief under Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), to abate the imminent and substantial endangerment to health and the environment caused by the Robeson County Landfill's ("the Landfill") contamination of groundwater and the Robeson County Water System public water supply with unsafe levels of per- and polyfluoroalkyl substances ("PFAS").

2. For years, Defendant has accepted solid waste from industries known to produce or use PFAS—a toxic, man-made class of chemicals that threaten human health, do not degrade over time, and travel long distances quickly through groundwater. Defendant handled, stored, and

disposed of this waste at the Landfill, which has a long history of mismanagement, operational problems, and pollution escaping the Landfill and contaminating nearby groundwater.

3. Defendant's past and present handling, storage, and disposal of PFAS-laden waste at the Landfill has contaminated groundwater with PFAS via leaching, seeps, and emissions of landfill gas. Defendant learned of this contamination no later than 2023, when sampling showed that groundwater beneath the Landfill was contaminated with exceptionally high levels of PFAS, including perfluorooctanoic acid ("PFOA"), hexafluoropropylene oxide dimer acid ("GenX"), perfluorooctanesulfonic acid ("PFOS"), and other toxic PFAS compounds.

4. Across the street from the Landfill, the Rocco Water Treatment Plant ("Rocco WTP"), a County-owned drinking water treatment plant, sources its water exclusively from four groundwater wells—all of which are located within 4,500 feet of the Landfill.

5. Because the Rocco WTP's conventional treatment system is not designed to remove PFAS, the toxic chemicals present in source groundwater are not eliminated prior to water distribution. Sampling in 2023 showed that treated water from the Rocco WTP had the highest level of PFAS of any finished drinking water in North Carolina, and the greatest concentration of GenX of any groundwater-based drinking water plant in the *nation*. The Rocco WTP's treated water contains at least ten toxic PFAS compounds that are known to cause harm to human health when ingested.

6. Testing of homes connected to County water near the Rocco WTP detected unsafe levels of these same ten PFAS compounds coming out of home faucets. All ten of the PFAS compounds detected in County-provided tap water have also been detected in groundwater at and around the Landfill.

7.      People who rely on the Robeson County Water System have therefore been, and continue to be, exposed to the many risks associated with exposure to these PFAS compounds. These risks include, but are not limited to, various types of cancer; reproductive and developmental harms; immune system effects; liver, kidney, heart, and spleen problems; and more.

8.      RCRA prohibits the handling, storage, treatment, transportation, and disposal of solid waste that may endanger health or the environment. Here, the County's handling, storage, and disposal of PFAS-laden waste has contaminated groundwater at and around the Landfill with PFAS, which has migrated into hydrologically connected groundwater that supplies the Rocco WTP, causing toxic PFAS to pollute the public water supply. This ongoing drinking water contamination violates RCRA because it may imminently and substantially endanger the health of those who drink or use County water.

9.      Defendant has known that County water is contaminated with dangerously high levels of PFAS from the Landfill for at least three years. During that time, Defendant has taken no action to eliminate the serious risks this pollution poses to Robeson County residents, even after Plaintiff and other community members repeatedly raised concerns to Defendant about this community health crisis. Plaintiff therefore seeks declaratory and injunctive relief to stop Defendant's RCRA violations and abate this imminent and substantial endangerment to health and the environment.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over the claims in this action under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331.

11.     This Court has personal jurisdiction over the parties in this case because this suit relates to activities or occurrences taking place in the state of North Carolina, specifically,

3

Defendant's operation of the Landfill and contamination of drinking water in Robeson County, North Carolina.

12. Plaintiff has complied with the pre-suit notice provisions of RCRA. Pursuant to Section 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A), on January 14, 2026, Plaintiff mailed notices of intent to file suit under RCRA to Robeson County, the Administrator of the Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, and the North Carolina Department of Environmental Quality ("DEQ"). [Hereinafter "the Notice," attached hereto as Exhibit 1 (Notice of Intent, and receipt of notice to Defendant, EPA, and DEQ), incorporated by reference herein]. The Notice complied with 42 U.S.C. §§ 6972(b)(2)(A) and 40 C.F.R. Part 254. More than ninety (90) days have passed since the Notice was received by Defendant and these agencies.

13. EPA has not commenced, nor is it diligently prosecuting, a civil action in a court of the United States under Section 7003 of RCRA, 42 U.S.C. § 6973, or under Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606, to address the imminent and substantial endangerment to health or the environment alleged in the Notice. EPA has not engaged in a removal action nor incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of CERCLA, 42 U.S.C. § 9604. EPA has not obtained a court order (including a consent decree) nor issued an administrative order under Section 106 of CERCLA, 42 U.S.C. § 9606, or Section 7003 of RCRA, 42 U.S.C. § 6973, pursuant to which the County is conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action at the Landfill. 42 U.S.C. § 6972(b)(2)(B).

14.     DEQ has not commenced, nor is it diligently prosecuting, an action under 42 U.S.C. § 6972(a)(1)(B) to address the imminent and substantial endangerment to health or the environment alleged in the Notice. DEQ has not engaged in a removal action under Section 104 of CERCLA, 42 U.S.C. § 9604. DEQ has not incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604 at the Landfill nor is it proceeding with a remedial action under CERCLA. 42 U.S.C. § 6972(b)(2)(C).

15.     Plaintiff will, immediately upon receipt of a file-stamped copy of this Complaint, serve a copy of this Complaint on the Attorney General of the United States and the EPA Administrator. 42 U.S.C. § 6972(b)(2)(F).

16.     Venue is proper in the Eastern District of North Carolina pursuant to 42 U.S.C. § 6972(c) because the violations and endangerment alleged in this Complaint have occurred, and continue to occur, in the Eastern District of North Carolina, and Defendant is a county located within the Eastern District. 42 U.S.C. § 6972(c); 28 U.S.C. § 1391(b)(2).

## PARTIES

**Plaintiff CAP and Its Members**

17.     CAP is a St. Pauls, North Carolina-based nonprofit membership association that was first incorporated in 1971 and is a "person" within the meaning of 42 U.S.C. §§ 6903(15) and 6972(a).

18.     CAP's mission is to promote and improve the health, general welfare, economic status, and living environment of underrepresented citizens of St. Pauls and Robeson County through education, recreation, and service.

19.     Defendant's PFAS pollution harms CAP's members. At the time of filing, CAP has approximately 30 members, many of whom live, work, worship, or spend time near the Landfill.

5

20. CAP has members who rely on PFAS-contaminated tap water supplied in whole or in part by the Rocco WTP for drinking water, cooking, washing, gardening, and other household uses.

21. Some CAP members have stopped drinking County-provided tap water at their homes because of their concerns that the Landfill has polluted their drinking water with PFAS. Some members have also expended significant sums of money to obtain alternative sources of water or to attempt to treat County water flowing into their homes in order to avoid risking health problems associated with drinking water contaminated with PFAS from the Landfill.

22. CAP also has members who work, patronize businesses, and attend church near the Landfill. These members rely on PFAS-contaminated County water supplied in whole or in part by the Rocco WTP for drinking, washing, and other uses while at these establishments.

23. Many members of CAP experience fear and anxiety about the impacts of the Landfill's pollution on their health and the well-being of their families. Several members are concerned that PFAS from the Landfill in their drinking water may be contributing to their chronic health conditions.

24. One member of CAP lives on land near the Landfill that has been in her family for nearly a century. After moving back to North Carolina to live on this property, she developed multiple health conditions that she believes may be associated with the Landfill's PFAS pollution. When she was diagnosed with Type II diabetes, she became especially concerned about PFAS pollution and whether it could be related to her diagnoses and the health conditions prevalent in her community, including cancer and heart disease. This member's home tap water, which is supplied by the Rocco WTP, has high levels of PFAS. Since learning this, she has had to purchase bottled water or use a filtration pitcher that requires expensive replacement filters, but this does

6

not fully satisfy her home water needs. Consequently, she occasionally drinks and cooks with unfiltered and PFAS contaminated tap water. She also uses it to wash dishes and clothes and water her vegetable garden. If the Landfill's PFAS were eliminated from County water, this member would return to drinking unfiltered tap water.

25. Another member of CAP, who has lived near the Landfill for more than 50 years, became afraid after learning her home tap water is contaminated with harmful levels of the same PFAS present at the Landfill. She is worried that the rare health issues that she and her family members have experienced could be related to the Landfill's PFAS pollution. She uses unfiltered County water in her home to cook and bathe, and she gives it to her pets. She purchases bottled water or drinks tap water that has been filtered by a pitcher, but she would prefer to be able to drink water directly from the kitchen sink and will not feel safe doing so unless and until the Landfill's PFAS is eliminated from the County water supply.

26. Another CAP member has lived in a home across from the Landfill for more than 25 years and has lived in the area since before the Landfill arrived. Before learning that the tap water she receives from the County is contaminated with high levels of PFAS, she and her family were drinking unfiltered tap water. After receiving her home's PFAS sampling results, she began purchasing bottled water for drinking and other household uses like cooking. Her household uses County water for bathing, brushing their teeth, gardening, and filling up their backyard pool, which her grandchildren play in frequently. Several of her family members live on the same street and either purchase bottled water because of their concerns about the Landfill's PFAS pollution, or they are drinking unfiltered County water. Many of her family members have health issues, including two siblings who have lived with or passed away from cancer. If the Landfill's PFAS were eliminated from the public water supply, this member and her family would return to drinking

7

unfiltered tap water, which would reduce both their health and safety concerns and the expenses associated with purchasing bottled water.

27. Another member of CAP who lives near the Landfill regularly visits friends, family members, and businesses connected to County water. She worries about her exposure risk when she swims and showers at a gym located near the Rocco WTP, and is concerned that the resale value of her home will be lowered by prospective buyers' fears of living near the Landfill and being unable to fully enjoy nearby amenities, like restaurants, that are impacted by the Landfill's contamination of the public water supply with PFAS.

28. The RCRA violations alleged herein have directly and substantially harmed, and will continue to harm, CAP's members' health, economic, and property interests. These injuries will not be redressed except by an order from this Court requiring Defendant to cease the Landfill's ongoing PFAS pollution of groundwater resources and stop sourcing County water from the Rocco WTP, or install technology at the Rocco WTP capable of eliminating PFAS; and in the interim, offer free, alternative water supplies to people who are provided water from the Rocco WTP for drinking, cooking, washing, gardening, and other household uses.

29. Enforcement by this Court as to CAP's claims asserted and relief sought in this Complaint, including injunctive relief to cease and remedy the violations, would provide redress for the injuries suffered by CAP and CAP's members. Because these injuries are caused by Defendant's disposal of solid waste containing PFAS, they fall within the zone of interests protected by RCRA's imminent and substantial endangerment provision.

**Defendant Robeson County**

30. Defendant is the owner and operator of the Robeson County Landfill, located at 246 Landfill Road, St. Pauls, North Carolina 28384.

31. Defendant is the owner and operator of the Rocco WTP, which provides drinking water for households, businesses, and places of worship that are connected to the County drinking water supply.

32. Defendant is a "political subdivision of a State" and thus, is a "person" within the meaning of RCRA, 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B).

## LEGAL BACKGROUND

33. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). RCRA's goal is to "promote the protection of health and the environment." 42 U.S.C. § 6902(a).

34. Section 7002(a)(1)(B) of RCRA authorizes citizen suits against "any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

35. Thus, citizens have a cause of action "against a defendant whose conduct—whether ongoing or purely in the past—'may' now pose an 'imminent and substantial endangerment to health or the environment.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 505 (4th Cir. 2015) (quoting 42 U.S.C. § 6972(a)(1)(B)).

36. A claim alleging imminent and substantial endangerment "may be brought regardless of whether the plaintiff can demonstrate that the defendant's actions violated a specific RCRA-based permit[.]" *Id.*

9

37. Exposure to drinking water contaminated in excess of maximum contaminant levels ("MCLs") set by EPA is highly probative—if not conclusive—evidence of the existence of an imminent and substantial endangerment. *See Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1228 (E.D. Wash. 2015).

38. RCRA imminent and substantial endangerment claims are "essentially a codification of the common law public nuisance" action but intended to be construed "more liberal[ly] than their common law counterparts." *United States v. Waste Indus., Inc.*, 734 F.2d 159, 167 (4th Cir. 1984) (quoting Subcomm. on Oversight and Investigations of the H. Comm. on Interstate & Foreign Com., 96th Cong., Rep. on Hazardous Waste Disposal 31 (Comm. Print No. 96-IFC 1979)); *see also Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001).

39. In the citizen suit provision, Congress used "expansive language that confers upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004) (internal quotation marks omitted) (citing *United States v. Price*, 688 F.2d 204, 213–14 (3d Cir. 1982)).

40. The term "person" means "an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 6903(15).

41. The term "solid waste" means "any garbage, refuse, sludge from a waste treatment plant . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . . ." 42 U.S.C. § 6903(27).

10

42. The term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). Operation of a municipal solid waste landfill constitutes "disposal" within the meaning of RCRA, including activities such as dumping of waste and migration of leachate into groundwater. *See Waste Indus., Inc.*, 734 F.2d at 164; *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 110 (E.D.N.Y. 2001); *see also Sierra Club v. Va. Elec. & Power Co.*, 903 F.3d 403, 411–12 (4th Cir. 2018).

43. Federal courts are authorized to issue injunctive relief under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a). Federal courts "have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in [Section 7002(a)](1)(B), to order such person to take such other action as may be necessary, or both."

44. Federal courts are authorized to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

45. Section 7002(e) of RCRA, 42 U.S.C. § 6972(e), authorizes the Court to "award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

11

## FACTUAL ALLEGATIONS

**Mobility, Persistence, and Toxicity of PFAS**

46. PFAS encompass a group of thousands of man-made chemicals that have been developed, manufactured, sold, and used broadly by industry since the 1940s. PFAS do not occur naturally in the environment; they are synthetic chemicals, used in various industrial processes due to their ability to repel water and other substances, stabilize heat and chemicals, and reduce friction.

47. The stable carbon-fluorine bonds that make PFAS so pervasive in industrial and consumer products also result in their persistence in the environment. PFAS do not easily biodegrade, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure. A major source of human exposure to PFAS is through ingestion of contaminated drinking water; consumption of produce irrigated using PFAS-containing water can also pose a risk.

48. PFAS are highly mobile and water soluble, which allows them to easily infiltrate and travel through groundwater. This risk is especially acute in regions like eastern North Carolina, where the groundwater table is high and pollutants need not travel far to reach the surficial aquifer, and where wells used for drinking water are often shallower than in other parts of the state.

49. PFAS are highly persistent and do not break down into benign substances once released into the environment, or upon entering human bodies. However, PFAS can degrade or transform into other kinds of PFAS compounds.

50. Given these properties, PFAS-contaminated leachate at landfills can easily seep or migrate into the surrounding environment, contaminating soil and groundwater with toxic PFAS. PFAS-contaminated leachate can travel through landfill liners and drainage systems, particularly when liners or covers are compromised or inadequately maintained or uncollected leachate is released into the environment.

12

51.     PFAS compounds pose a significant threat to human health when ingested in drinking water, even at concentrations so low they are measured in parts per trillion ("ppt").

52.     Two of the most studied PFAS—perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS")—are bioaccumulative and highly persistent in humans. These chemicals are associated with developmental effects to fetuses and infants, kidney and testicular cancer, liver malfunction, hypothyroidism, high cholesterol, ulcerative colitis, decreased immune response to vaccines, reduced hormone levels, delayed puberty, and lower birth weight and size.

53.     EPA has conducted toxicity assessments for PFOA and PFOS, which determined, among other things, that these chemicals harm children's immune systems and reduce vaccine effectiveness at extremely low exposure levels, in the parts-per-quadrillion range.

54.     EPA also determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe. EPA concluded that any release of PFOA and PFOS "may present substantial danger to the public health or welfare or the environment."

55.     Other PFAS compounds are similarly harmful to human health and the environment. For example, studies have determined that shorter-chain hexafluoropropylene oxide dimer acid and its ammonium salt ("HFPO-DA" or "GenX chemicals")—manufactured by E.I. du Pont de Nemours and Company ("DuPont") and Chemours Company, FC, LLC ("Chemours") to replace long-chain PFAS like PFOA and PFOS—"are associated with similar adverse toxicological effects;" "can be equally environmentally persistent and are even more mobile in the environment and more difficult to remove from drinking water;" and still bioaccumulate in both humans and animals.

13

56. Exposure to GenX can lead to degraded liver and kidney functions, compromised immune system, development issues, and cancer. In addition to altering gene expression during fetal development, GenX increases both maternal and fetal liver toxicity.

57. Research also shows that perfluorobutane sulfonic acid ("PFBS") is associated with harmful thyroid, developmental, and kidney effects, as well as increased risk of asthma.

58. Toxicological studies confirm that similar health consequences occur from exposure to many other PFAS compounds, including perfluorohexanoic acid ("PFHxA"), perfluorobutanoic acid ("PFBA"), and perfluorohexanesulfonic acid ("PFHxS"). For instance, in April 2023, EPA issued a toxicological review of PFHxA, evaluating existing scientific literature and concluding that the chemical "likely causes" liver, developmental, and immune system complications and decreased red blood cell counts in humans exposed to the chemical.

59. EPA also released a draft human health toxicity assessment for PFHxS, finding that PFHxS is associated with decreased levels of total thyroxine (T4), a thyroid hormone that is important for many of the human body's functions. PFHxS can travel through the umbilical cord during pregnancy and breast milk following birth, may disrupt the body's ability to break down or store lipids, and can cause oxidative stress and inflammation in embryonic development.

60. Studies of perfluoropentanoic acid ("PFPeA") found that this compound readily crosses the placenta and has been found at heightened levels in pregnant women with gestational diabetes mellitus.

61. Exposure to these and other PFAS compounds, such as perfluoropentane sulfonic acid ("PFPeS") and perfluoroheptanoic acid ("PFHpA"), may increase the risk of other health problems and may break down into other PFAS compounds known to be harmful to human health.

14

62. In recognition of the serious human health risks associated with PFAS exposure, EPA and DEQ have taken several steps to protect the public from exposure to these toxic chemicals.

63. In June 2022, EPA established interim updated lifetime health advisories for PFOA and PFOS in drinking water of 0.004 ppt and 0.02 ppt, respectively, and a final lifetime health advisory of 10 ppt for GenX chemicals.

64. In April 2024, EPA finalized targets based solely on health effects under the Safe Drinking Water Act—called "maximum contaminant level goals"—of *zero ppt* for PFOA and PFOS. This reflects EPA's finding, based on the best available science, that no level of exposure to these chemicals is safe. Similarly, EPA set the maximum contaminant level goal for GenX chemicals at 10 ppt.

65. Research has also shown that exposure to multiple PFAS compounds, even at lower levels, can have cumulative health effects and can increase the risk of adverse health risks, including liver, immune, and thyroid effects. According to EPA, "exposure to mixtures of [perfluorononanoic acid ("PFNA"), PFHxS, PFBS, and GenX] may have additive health impacts."

66. EPA has also set enforceable MCLs for PFOA, PFOS, and GenX in drinking water (4 ppt, 4 ppt, and 10 ppt, respectively), but these limits incorporate considerations beyond health risks. Exposure to levels of PFOA and PFOS lower than 4 ppt has been shown to harm human health.

67. In 2024, EPA listed PFOA and PFOS as hazardous substances under CERCLA.

68. On November 1, 2025, DEQ established groundwater standards of 0.001 ppt for PFOA, 0.7 ppt for PFOS, and 10 ppt for GenX. 15A N.C. Admin. Code 02L .0202(h).

15

**The Robeson County Landfill and Groundwater Contamination**

69. Defendant Robeson County owns and operates the 537-acre Robeson County Landfill located at 246 Landfill Road in St. Pauls, North Carolina.

70. The Landfill's waste disposal area is comprised of multiple landfill "phases," some of which are closed (i.e., no longer accepting waste for disposal) and some of which are still actively accepting waste. Phase 1 is a closed, unlined municipal solid waste ("MSW") landfill beneath an active construction and demolition landfill unit. Phases 2 and 3 are closed, lined MSW units. Phases 4, 5, and 6 are active, lined MSW units.

71. Landfills produce wastewater known as "leachate," which is formed when liquid percolates through or otherwise comes in contact with landfill waste. The Landfill utilizes a leachate collection system intended to capture leachate from Phases 2, 3, 4, 5, and 6 of the Landfill. Leachate generated by Phase 1 of the Landfill—the unlined, closed MSW unit and unlined construction and demolition unit—is not contained by a liner or captured by the leachate collection system.

72. Across units, DEQ has documented Defendant's years-long track record of persistent non-compliance with basic operational requirements of its solid waste permit at the Landfill. Overgrown vegetation, recurring seeps at the base of the Landfill, ponding of wastewater, trash floating in water, inadequate signage and markings of the edge of waste, failure to implement monitoring requirements, unresolved threats to landfill liner integrity, and numerous leachate releases are common occurrences.

73. Phase 1 of the Landfill has previously been identified as the source of significant groundwater pollution in the area. In 2008, for example, Defendant's consultant reported that this unlined unit was contaminating groundwater both downgradient (via leaching of rainwater) and

16

upgradient (via migration of landfill gas) with volatile organic compounds. Today, mandatory groundwater monitoring shows high levels of some volatile organic compounds and heavy metals—well in excess of state groundwater quality standards—across the Landfill property.

74. State-mandated groundwater monitoring also shows that groundwater standards for various contaminants are frequently exceeded beneath the Landfill's lined phases, suggesting the liners are not preventing the migration of PFAS-contaminated leachate from the Landfill into groundwater.

75. Pollutants, including PFAS, are also released into the environment through emissions of landfill gas. Landfill gas is created by waste decomposition within a landfill and is composed of methane, carbon dioxide, and other constituents present in landfill waste. Even when a landfill uses a gas collection and control system, landfill gas can still be released as fugitive emissions, especially when the collection system and landfill covers are not properly operated or maintained. The pollutants landfill gas contains, including PFAS, can then migrate into groundwater.

76. DEQ has found that the Landfill has "an ongoing problem" with inadequate cover and improper operation of its landfill gas collection and control system. Defendant's mismanagement of this system has included, but is not limited to, exceeding size requirements for the area where waste is actively being deposited for disposal, improperly maintaining the inactive areas, infrequently applying cover material or applying the wrong type of cover, and allowing the side slopes to erode. Inadequate cover and improper management of the landfill gas collection and control system leads to the release of landfill gas into the surrounding air.

77. According to Defendant's self-reported data from 2011 through 2024 pursuant to the EPA's Greenhouse Gas Reporting Program, over one-third of the landfill gas at the Landfill is released through fugitive emissions.

78. Pollution from the Landfill has a history of migrating into groundwater north of the Landfill. In 2008, Defendant's consultant determined that contaminated groundwater on the north side of the property was caused by a "migration of landfill gas from Phase 1 towards the north through the process of phase transference of contaminants from landfill gas into groundwater."

79. According to a Site Plan and Site Hydrogeologic Report submitted by Defendant to DEQ in May 2020, "[t]he only known source of groundwater contamination" at this site "is the landfill facility."

**PFAS Contamination at the Landfill**

80. During its long history of mismanaging solid waste at the Landfill and contaminating nearby groundwater with other pollutants, Defendant was also importing waste from known sources of PFAS. Defendant's handling, storage, and disposal of this PFAS-containing waste has caused or contributed to the groundwater PFAS contamination in the area.

81. From at least 1994 until 2001, the Landfill accepted as much as two tons of sludge per day from Alamac Knit Fabrics, Inc. ("Alamac"), a textile manufacturer whose property in Lumberton is contaminated with many of the same PFAS present at high levels in groundwater at and around the Landfill.

82. From at least 2017 until 2025, the Landfill accepted waste from Chemours and DuPont, which historically manufactured GenX chemicals and other PFAS compounds at their Bladen County Fayetteville Works factory. Chemours' and DuPont's PFAS manufacturing practices at Fayetteville Works contaminated that site with many of the same PFAS compounds

18

that—after the Landfill accepted more than 5,600 tons of waste from the site over eight years—are now present in the groundwater at and around the Landfill.

83.     Defendant has handled, stored, and disposed of PFAS-contaminated waste from these sources and other users and manufacturers of PFAS at the Landfill.

84.     The Robeson County Landfill has some of the highest levels of PFAS detected at any landfill in the state of North Carolina.

85.     This PFAS contamination, present in both the Landfill's leachate and groundwater, is documented in several state-mandated reports covering the period of 2023 to 2025, including semi-annual monitoring reports ("Monitoring Reports") and a PFAS Assessment. The PFAS Assessment, which documented testing from October 2025, included sampling of 20 additional PFAS compounds not previously assessed in the Monitoring Reports.

86.     The Monitoring Reports and PFAS Assessment documented extremely high PFAS levels[1] in leachate from Phases 2, 3, 4, and 5:

---

[1] As used herein, "PFAS level(s)" refers to the sum of all PFAS compounds that were tested for in a given sampling event.

19

| PFAS Levels in Landfill Leachate (ppt) | | | | |
|---|---|---|---|---|
| Report (date of report) | Phase 2 | Phase 3 | Phase 4 | Phase 5 |
| Monitoring Report (Fall 2023) | 12,455 | 8,378 | 156,637 | 3,022 |
| Monitoring Report (Spring 2024) | 28,464 | 8,623 | 198,302 | 5,729 |
| Monitoring Report (Fall 2024) | 5,829 | 26,343 | 134,656 | 17,199 |
| Monitoring Report (Spring 2025) | 40,490 | 2,075 | 117,188 | 20,645 |
| Monitoring Report (Fall 2025) | 27,337 | 26,802 | 84,093 | 26,306 |
| PFAS Assessment (Feb. 2026) | 37,084 | 280,673 | 592,286 | 290,566 |

87. All five of the Monitoring Reports and the PFAS Assessment reported the presence of numerous PFAS compounds in the Landfill's leachate, including PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS.

88. Both the Monitoring Reports and PFAS Assessments also document persistent, widespread PFAS contamination of groundwater at and around the Landfill, demonstrating that PFAS-contaminated leachate has seeped into and contaminated this groundwater.

89. During every sampling event documented by these reports, PFAS were detected in every one of the groundwater monitoring wells sampled.

90. In November 2024, DEQ issued a Notice of Regulatory Requirements to Defendant due to exceedances at the Landfill of state groundwater standards for PFAS, including PFOA, GenX, PFOS, PFHxS, and PFNA.

91.     In addition to PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS, and other PFAS compounds that had been found at every previous monitoring event, the PFAS Assessment reported the presence of several additional PFAS compounds, suggesting that the actual PFAS levels in the Landfill's leachate and groundwater could be even higher than what has been measured.

**PFAS Contamination North of the Landfill**

92.     The Rocco WTP is located on Highway NC 20 East, approximately half a mile northeast of—and downwind from—the Landfill, and sources its water from four groundwater wells all located less than a mile away from the Landfill.

93.     The Rocco WTP's withdrawal of groundwater in such close proximity to the Landfill creates a cone of depression that pulls groundwater toward the plant's source wells from all directions, regardless of background hydrologic gradients. This causes groundwater from beneath the Landfill to flow north and northeast towards the Rocco WTP, and downward towards the intake point of the Rocco WTP's groundwater wells.

94.     The Landfill has several groundwater monitoring wells located north and northeast of the Landfill's waste disposal areas and situated between the Landfill and the Rocco WTP (MW-6, MW-12, MW-26, MW-31, and PZ-35).

21



**Landfill Monitoring Wells' Proximity to Rocco WTP Source Wells**

95. Of these north and northeastern wells, only MW-6, MW-12, and MW-26 were included in the sampling events documented in the Monitoring Reports. The PFAS Assessment also included MW-31 and PZ-35.

96. The County's Monitoring Reports and PFAS Assessment documented high levels of PFAS at all these monitoring wells, including PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS.

97. PFAS levels documented by these reports are especially high at MW-12 and MW-26:

| PFAS Levels in Groundwater North-Northeast of the Landfill (ppt) | | |
|---|---|---|
| Report (date of report) | MW-12 | MW-26 |
| Monitoring Report (Fall 2023) | 81,442 | 87,687 |
| Monitoring Report (Spring 2024) | 81,602 | 1,303 |
| Monitoring Report (Fall 2024) | 78,815 | 100,333 |
| Monitoring Report (Spring 2025) | 99,790 | 84,602 |
| Monitoring Report (Fall 2025) | 70,676 | 84,502 |
| PFAS Assessment (Feb. 2026) | 78,373 | 81,732 |

98. Sampling summarized in both the County's Monitoring Reports and PFAS Assessment has also consistently detected PFAS at MW-6, the groundwater monitoring well that is located furthest north and east of the existing landfill phases and closest to the Rocco WTP.

99. In addition to PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS, and other PFAS compounds that had been found during every previous groundwater monitoring event, the PFAS Assessment—which tested for 20 PFAS not previously sampled for in the Monitoring Reports—reported the presence of several of these additional compounds, suggesting that the actual PFAS levels in the Landfill's groundwater could be even higher than what has been measured.

**PFAS Contamination at the Rocco WTP and Finished Drinking Water**

100. The Rocco WTP was originally constructed in 1988 and was most recently upgraded in 2018, when its capacity was increased from 2 million gallons per day to 6 million gallons per day.

23

101. The Rocco WTP employs a conventional water treatment process that is not designed to remove or destroy PFAS.

102. The Rocco WTP sources water exclusively from four Robeson County Water Department groundwater source wells. These wells are identified as Well #17, 18, 19, and 21.

103. Well #17 is located 2,089 feet from the Landfill.

104. Well #18 is located 4,307 feet from the Landfill.

105. Well #19 is located 4,040 feet from the Landfill.

106. Well #21 is located 3,328 feet from the Landfill.

107. On February 14, 2023, July 25, 2023, and October 1, 2024, the County conducted three sampling events of the Rocco WTP's finished water as required by EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR-5").

108. During each of these three sampling events, nine PFAS compounds were detected at the Rocco WTP—PFOA, GenX, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS—all of which were also present in groundwater monitoring wells north of the Landfill:

| PFAS Compound | UCMR-5 Sampling of Finished Water at Rocco WTP (ppt) | | |
|---|---|---|---|
| | 2/14/2023 | 7/25/2023 | 10/1/2024 |
| PFOA | 22 | 30 | 29 |
| GenX | 34 | 33 | 28 |
| PFBA | 9.4 | 11 | 9.8 |
| PFPeA | 27 | 29 | 28 |
| PFBS | 8.5 | 8.2 | 8.6 |
| PFHxA | 23 | 25 | 25 |
| PFPeS | 4.4 | 4.7 | 4.8 |
| PFHpA | 13 | 16 | 16 |
| PFHxS | 8.4 | 8.3 | 8.5 |
| **Total** | **149.7** | **165.2** | **157.7** |

109. PFOS is also present in the Rocco WTP's finished water at unsafe levels.

110. Every PFAS compound observed in the UCMR-5 sampling was also found during a March 17, 2026, sampling event of the Rocco WTP's finished water. The sampling results showed 39 ppt PFOA, 37 ppt GenX, 14 ppt PFBA, 37 ppt PFPeA, 13 ppt PFBS, 36 ppt PFHxA, 7.7 ppt PFPeS, 25 ppt PFHpA, and 16 ppt PFHxS, as well as 5.4 ppt PFOS.

111. Based on UCMR-5 sampling—which all water treatment plants above a certain size were required to complete—the Rocco WTP's finished water has the highest PFAS levels of any water treatment plant in North Carolina and the highest concentration of GenX of any groundwater-based water system in the United States.

112. Since at least February 14, 2023, the Rocco WTP has been supplying PFAS-contaminated water to the County drinking water system, where it is distributed to homes, businesses, and place of worship across Robeson County.

113. The Rocco WTP's distribution of PFAS-contaminated water throughout the County water system is ongoing.

114. Testing of tap water in 14 homes served by the Rocco WTP, conducted on November 18, 2025, found PFAS levels ranging from 65.25 ppt to 181.95 ppt. All ten of the PFAS compounds that have been detected in the Rocco WTP's finished water were also present in the tap water in these homes at levels as high as 35.6 ppt PFOA, 28.7 ppt GenX, 3.36 ppt PFOS, 11 ppt PFBA, 33.8 ppt PFPeA, 11.1 ppt PFBS, 32.3 ppt PFHxA, 6.66 ppt PFPeS, 21.3 ppt PFHpA, and 9.76 ppt PFHxS.



115. Testing by the County in March 2026 confirmed the ongoing presence of PFAS in some of the previously tested homes—and in additional homes—served by County water. Levels of PFAS were as high as 41 ppt PFOA, 33 ppt GenX, 5 ppt PFOS, 14 ppt PFBA, 37 ppt PFPeA, 12 ppt PFBS, 34 ppt PFHxA, 6.9 ppt PFPeS, 23 ppt PFHpA, and 13 ppt PFHxS.

116. The presence of PFOA or PFOS—at any level—is unsafe for human consumption. Likewise, exposure to the levels of other PFAS compounds present at these and other homes in the area poses serious risks to human health.

117. Each and every one of the PFAS compounds found in County-provided drinking water—including PFOA, GenX, and PFOS—were also detected in the Landfill's leachate and in monitoring wells located between the waste disposal area and the Rocco WTP.

## CLAIM FOR RELIEF

### Count I: Imminent and Substantial Endangerment under the Resource Conservation and Recovery Act (42 U.S.C. § 6972(a)(1)(B))

118. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

119. Defendant is a person who has contributed or who is contributing to the past or present handling, storage and disposal of solid waste which may present an imminent and substantial endangerment to health or the environment within the meaning of 42 U.S.C. § 6972(a)(1)(B).

120. Defendant is the past and present owner and operator of the Robeson County Landfill.

121. The PFAS-contaminated waste handled, stored, and disposed of at the Landfill, as well as individual PFAS compounds, are "solid waste" as that term is defined under RCRA, 42 U.S.C. § 6903(27).

27

122. Defendant's past and present operation of the Landfill constitutes the handling, storage, and disposal of solid waste.

123. Defendant's handling, storage, and disposal of solid waste at the Landfill has caused or contributed to the groundwater in and around the Landfill becoming contaminated with PFAS, including PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS.

124. This PFAS contamination of groundwater has breached the four public water supply wells that supply all the water distributed by the Rocco WTP. The Landfill's PFAS contamination has migrated into these wells through hydrologically connected groundwater and via emissions of landfill gas, including fugitive emissions.

125. Four sampling events have shown finished water from the Rocco WTP is contaminated with at least ten toxic PFAS: PFOA, GenX, PFOS, PFBA, PFPeA, PFBS, PFHxA, PFPeS, PFHpA, and PFHxS. Each and every one of these compounds is associated with detrimental effects, and exposure to any of these compounds may present an imminent and substantial endangerment to health and the environment.

126. Sampling of homes near the Rocco WTP demonstrates that all ten of the compounds in the Rocco WTP's finished water are present at the point of use, whether for drinking, bathing, cooking, gardening, or other purposes, exposing residents near the plant to these harmful substances.

127. Exposure to any level of PFOA in drinking water may harm human health and increases the risk of cancer in humans.

128. PFOA has been detected in the Rocco WTP's finished water during every sampling event, with levels ranging from 22 to 30 ppt.

129. PFOA is present at the point of use in homes that receive water from the Rocco WTP, and has been detected at levels as high as 35.6 ppt.

130. Exposure to GenX in drinking water may harm human health.

131. GenX has been detected in the Rocco WTP's finished water during every sampling event, with levels ranging from 28 to 34 ppt.

132. GenX is present at the point of use in homes that receive water from the Rocco WTP, and has been detected at levels as high as 33 ppt.

133. Exposure to any level of PFOS in drinking water may harm human health and increases the risk of cancer in humans.

134. PFOS was detected in the Rocco WTP's finished water as recently as March of this year at 5.4 ppt.

135. PFOS is present at the point of use in homes that receive water from the Rocco WTP, and has been detected at levels as high as 5 ppt.

136. The Rocco WTP's finished water also contains PFBA, PFBS, PFHpA, PFHxA, PFHxS, PFPeA, and PFPeS. Each of these compounds have also been detected in numerous homes that receive water from the Rocco WTP.

137. Studies have linked exposure to PFBA, PFBS, PFHpA, PFHxA, PFHxS, PFPeA, and PFPeS to adverse health impacts.

138. Exposure to multiple PFAS compounds has an additive effect that creates an even greater cumulative risk to health than exposure to individual compounds.

139. The presence of unsafe levels of PFAS in the Rocco WTP's finished water and in the tap water of homes that get their water from the Rocco WTP may imminently and substantially endanger human health.

29

140. Thousands of Robeson County residents in northern Robeson County, including members of CAP, use PFAS-contaminated tap water from the Rocco WTP for drinking, cooking, gardening, cleaning, and other household tasks. Finished water from the Rocco WTP may travel even further through the County water system, which serves 67,970 customers, meaning the potential number of people exposed could be much greater than just those near the Rocco WTP in northern Robeson County.

141. Defendant's handling, storage, and disposal of PFAS-laden solid waste at the Landfill, and continued distribution of PFAS-contaminated water from the Rocco WTP, has endangered and continues to imminently and substantially endanger these people's health.

142. This endangerment to health and the environment is ongoing as of the date of this Complaint.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

1. Enter a Declaratory judgment that the County's handling, storage, and disposal of PFAS-containing solid waste at the Landfill may present an imminent and substantial endangerment to health or the environment in violation of RCRA;

2. Enter an enforcement order or injunction requiring Defendant to abate and remediate its ongoing PFAS pollution of groundwater at and around the Landfill; immediately cease use of the Rocco WTP until treatment technology capable of consistently and effectively eliminating PFAS is operational and regular sampling confirms that PFAS are no longer present in finished water; and to the extent the County's water distribution needs cannot be met in the interim before treatment technology is installed without the use of the Rocco WTP, order the County to provide residents who are provided water from the Rocco WTP with a safe and alternative water

30

supply for home use at no cost to address the dangers of drinking water that is contaminated with PFAS;

3.    Award Plaintiff its fees, costs, and expenses incurred in this litigation, including reasonable attorney's fees, costs, and expert fees and expenses pursuant to Section 7002(e) of RCRA, 42 U.S.C. § 6972(e);

4.    Retain jurisdiction over this action until the endangerment alleged herein is fully and permanently abated, and the County has come into consistent and permanent compliance with RCRA; and

5.    Grant other such relief as the Court deems just and proper.

Respectfully submitted this 16th day of June, 2026.

*/s/ James S. Whitlock*
James S. Whitlock, NC Bar No. 34304
Southern Environmental Law Center
48 Patton Avenue, Suite 304
Asheville, NC 28801
Phone: (828) 258-2023
Fax:    (828) 258-2024

Heather Hillaker, NC Bar No. 49267
Zoe Mehta, NC Bar No. 60883
Southern Environmental Law Center
136 E. Rosemary St., Ste. 500
Chapel Hill, NC 27514
Phone: (919) 967-1450
Fax:    (919) 929-9421

*Attorneys for Plaintiff St. Pauls Community Association for Progress*